SOMMERS. v. COMMISSIONER OF INTER-
NAL REVENUE.

No. 666.

Circuit Court of Appeals, Tenth Circuit.

Feb. 20, 1933.

E. R. Campbell, of Denver, Colo. (Elmer L. Brock, John P. Akolt, and Milton Smith, Jr., all of Denver, Colo., on the brief), for petitioner.

Andrew D. Sharpe, Sp. Asst. to the Atty. Gen. (G. A. Youngquist and Sewall Key, Sp. Assts. to the Atty. Gen., C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Arthur Clark, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

COTTERAL, Circuit Judge.

The income tax involved is of the deceased husband of petitioner, for the calendar year 1922. A deficiency was found by the Commissioner, of $16,615.23, as to which there were some adjustments, leaving a net deficiency of $14,531.26. A redetermination was sought before the Board of Tax Appeals,

and the Commissioner's holding was affirmed. The administratrix now appeals to this court, asserting there was error in arriving at the deficiency.

From 1908 to 1920, Sommers was general manager of the Great Western Oil Company, doing business in Colorado, Utah, and Wyoming. Under his management the company acquired a valuable patronage and its affairs prospered. In 1920, he and his associates offered to buy the business for $70,000, but it was sold to Gates Oil Company for $150,000, and $20,000 was donated to him by the vendor, provided he would cancel his contract with the Gates Oil Company and not interfere with the sale.

His next enterprise was to organize the Sommers Oil Company, in the same field. He secured the co-operation of the Continental Oil Company, and agreed with it he would subscribe for 60 per cent. of the stock of the new company, and the Continental would subscribe for the remainder. The plan was carried out, except for the issuance of a few qualifying shares to directors. The Sommers Oil Company was organized in 1920. Its books show the capital stock was issued for $100 a share, paid in cash. He paid for his stock, in cash, as follows: July 17, 1920, $12,000; August 24, 1920, $12,000; October 18, 1920, $18,000; February 1, 1921, $12,000; total $54,000. The Continental also paid likewise for its shares.

■ At the time the Sommers Oil Company was organized Sommers owned a lease on the property of Neef Bros. Brewing Company, at Denver, Colo., near the tracks of the Denver & Rio Grande Railroad Company, and certain trackage rights secured from that company, suitable for the wholesale business of the oil company. He assigned the lease and trackage rights to the company, but it does not appear that he was paid anything therefor. He also transferred to the new company the account of the Quaker State Oil Company, but it was held by him as president of the new company and belonged to it. That company prospered and did a large business. In November, 1922, he sold his stock in that company for $142,000. In computing his profit on the sale, the Commissioner used as a basis the cost of his stock ($54,000), and computed the gain by deducting that sum from the sale price of the stock. This was in accordance with section 202 (a) of the Revenue Act of 1921 (42 Stat. 229), which provides that gain or loss in a sale transaction shall be ascertained on a basis of cost.

But the petitioner contends the proper basis was $129,000, measured by the cash paid and the additional assets turned to the company for his 60 per cent. interest, or the actual value of the stock as shown by bona fide offers therefor after the Sommers Oil Company was organized.

There are obvious reasons for refusing petitioner's contentions. One of them is that there was no record or proof that the Sommers Oil Company ever rendered any consideration for the lease and trackage rights transferred by him to the company. The evidence of their value was properly excluded. The only proof is contained in the books of the company, which show the issuance of stock for the cash par value thereof, and this occurred at the dates of the issues, subsequent to the transfer.

■ An item of good will is relied upon as being exchanged for the stock. But it had been earned by him as a representative of the Great Western Oil Company, belonged to it, passed to the Gates Oil Company, and was not assignable by him, as his property or personal asset, to the Sommers Oil Company. Good will is not susceptible of separate ownership or transfer. It arises only out of a particular business, and has no existence apart from it. Pfleghar Hardware Specialty Company v. Blair (C. C. A.) 30 F.(2d) 614; Metropolitan Bank v. St. Louis Dispatch Co., 149 U. S. 436, 13 S. Ct. 944, 37 L. Ed. 799; In re Leslie-Judge Co. (C. C. A.) 272 F. 886. Another difficulty with the contention is that there was no showing of any transfer of good will to the Sommers Oil Company. It did have the benefit of Sommers' influence and the patrons he had attracted in his connection with the Great Western Oil Company. But, as stated, that good will passed to the Gates Oil Company. There was not, and could not be, any transfer of it to the Sommers Oil Company.

■ The petitioner also relies on the value of the stock he acquired from the Sommers Oil Company, and complains of the exclusion of evidence offered to show the stock was worth not less than $250 a share, and his 60 per cent. interest in the company was worth not less than $129,000. The evidence was not admissible, in view of section 202 (e) of the Revenue Act of 1921, which provides that "no gain or loss shall be recognized unless the property received in exchange has a [definite and] readily realizable market value." There was no evidence of any market value of the property exchanged for the stock, except the cash paid for it.

That was the statutory method of reaching the value of the stock, because the stock could have no market value until it was issued. None of it was for sale. Later offers for the stock were not evidence of such value. Sharp v. United States, 191 U. S. 341, 24 S. Ct. 114, 48 L. Ed. 211. The test would be the value on the organization of the company, and not afterward at the dates shown in the offers of the proof.

Another question remains. The stock was bargained for in 1920, issued at different dates, the last block of 120 shares February 1, 1921, and the sale of all was made in November, 1922. Was that block taxable as a capital net gain as contended by petitioner, or as ordinary net income, as ruled by the Board? It is urged that Sommers' interest was a unit—60 per cent. of the stock—and should be construed to have been issued as of the date of the agreement. That agreement was binding on the subscribers, but not the corporation. Crosby v. Stratton, 17 Colo. App. 220, 68 P. 130. His investment increased with each issue of stock, and the value of it was not affected by the previous investments. The effective date of his stock rights was that of issuance of the stock. Until that date, there was not a final subscription, and the last stock issued represented no interest theretofore invested in the capital of the company. Section 206 (a) (6), Revenue Act of 1921, which applies, provides that "capital assets" mean property acquired and held by the taxpayer for profit or investment for more than two years. The stock could not therefore be a "capital asset" within the meaning of that section.

We are of the opinion that the Board of Tax Appeals correctly decided the controversy, and its decision is accordingly affirmed.